IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SNL FINANCIAL, LC, | ) |
| Plaintiff, | ) |
| vs. | ) Civil No. 3:09cv00010 |
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) |
| Defendant. | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Philadelphia Indemnity Insurance Company, by counsel, submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, and states as follows:

**I.     BACKGROUND FACTS**

Plaintiff SNL Financial, LC ("SNL") filed an action for declaratory relief against Philadelphia Indemnity Insurance Company ("Philadelphia") to determine its rights under a policy of insurance issued to SNL by Philadelphia. Philadelphia filed a Counterclaim against SNL seeking rescission of the policy based on SNL's material misrepresentation in its application and a declaration that no duty to defend or indemnity SNL is owed due to SNL's violation of the notice and claim reporting provisions in the policy.

The policy at issue is Philadelphia's Private Company Protection Plus policy no. PHSD350225, insuring SNL for the period August 1, 2008 to August 1, 2009, with limits of liability of $1,000,000 (Statement No. 1). The Policy was a renewal of the prior year's coverage effective 8/1/07-8/1/08 (Statement No. 2).

The claim at issue is an employment discrimination claim made by Stephen Greenberg, a former employee in the New York office of SNL (Statement No. 3). Greenberg was hired on or about April 4, 2007 when SNL acquired Jupiter Kagan, and he was terminated about five months later for poor sales performance (Statement Nos. 3, 4). Greenberg alleged that his immediate supervisor at SNL, Will Pappas, systematically discriminated against him due to his age and the fact that he had cancer, a perceived disability (Statement No. 5). Greenberg retained a well-known plaintiff's employment attorney, Murray Schwartz, to represent him with regard to his claims of discrimination based on age and perceived disability (Statement No. 6). On or about January 18, 2008, attorney Schwartz sent a letter to SNL advising the company that Greenberg had a claim for "discriminatory conduct", and requesting a meeting to discuss issues and an "amicable resolution" (Statement No. 6).

SNL's immediate reaction to the claim letter was to retain counsel of its own to investigate and respond (Statement No. 8). SNL's Chief Talent Officer, Michael Latsko, sent an e-mail on January 23, 2008 to Sean Gibbons, an attorney who specializes in labor and employment law at the firm of Williams Mullen in Richmond, attaching the January 18, 2008 letter (Statement Nos. 9, 10). The e-mail was titled "Stephen Greenberg Legal Action" (Statement No. 8). Gibbons understood that he was being retained with respect to the employment discrimination claim of Greenberg, and to assess the exposure of the claim (Statement No. 10). SNL and Gibbons understood that by the letter of January 18, 2008, Greenberg's counsel might be seeking non-monetary relief, such as reinstatement (Statement No. 7). Because Gibbons felt that it was likely that the Greenberg matter would end up in federal court, he sent an e-mail titled

"Litigation Hold" to Latsko at SNL to preserve all evidence, including electronically stored information to comply with the Federal Rules (Statement No. 11). SNL and its counsel then began to investigate the merits of the Greenberg claim (Statement No. 12).

Greenberg's attorney, Murray Schwartz, sent another letter to SNL dated January 25, 2008, regarding Greenberg's employment discrimination claim, as SNL had not responded to his first letter (Statement No. 13). Gibbons then sent a letter of representation to Schwartz on February 1, 2008, and Latsko sent an e-mail to Schwartz confirming Gibbons' retention as counsel for SNL (Statement No. 14). A few days later, Gibbons placed a telephone call to Schwartz to determine if he had a monetary demand to resolve the Greenberg claim (Statement No. 15). During the ensuing months of February, March and April 2008, counsel for SNL exchanged calls with Schwartz and continued attempts to discuss the Greenberg claim (Statement No. 16).

On May 6, 2008, counsel for SNL was able to speak to Schwartz about the merits of the claim (Statement No. 17), and on June 18, 2008, counsel for SNL learned that Schwartz had prepared a draft complaint on behalf of Greenberg against SNL to be filed in the Supreme Court of New York (Statement Nos. 19, 20). Gibbons discussed the allegations in the draft complaint in detail with Schwartz on July 14, 2008, memorializing the conversation in a memo to his file (Statement Nos. 22). Gibbons wanted to determine what type of discriminatory conduct was being claimed in the draft complaint (Statement No. 23). Beginning with the January 18, 2008 notice of claim letter, Gibbons fully understood that Greenberg was seeking money damages, noting "of course they're after money. They wouldn't be in business otherwise" (Statement No. 24). The only other remedy that Greenberg would possibly seek was non-monetary relief, such as

3

reinstatement (Statement No. 25).

Schwartz did not want to send a copy of the complaint to Gibbons, so Gibbons arranged for attorney James Clark, local New York counsel, to review the draft complaint on behalf of SNL (Statement Nos. 26, 33). Clark visited Schwartz's office, reviewed the allegations of the complaint, and wrote a memo to Gibbons regarding Greenberg's allegations of age and perceived disability discrimination, advising that the *ad damnum* was $16,000,000 plus attorneys' fees and costs (Statement No. 34). Upon learning of the allegations of the complaint by Greenberg and the *ad damnum* stated in the complaint, counsel for SNL advised it to "sit tight" (Statement No. 35, 40). However, SNL fully understood that the Greenberg claim could end up in court (Statement 36). Throughout the period from January 18 through July, 2008, Philadelphia was never notified of the complaint.

At around the same point in time, during the month of July 2008, SNL's insurance policy with Philadelphia was up for renewal (Statement No. 27). Handling the details of the renewal, including the completion of the Renewal Application, was the responsibility of SNL's Controller, Corinna Hearn, who had just been hired in June 2008 (Statement Nos. 18, 27). Hearn worked with SNL's insurance agency, Lee Insurance Agency, and consulted with various SNL employees to obtain the necessary information to complete the Renewal Application (Statement Nos. 27, 28). Hearn completed the Renewal Application, with the exception of the answer to question #24 on SNL's knowledge of any litigation, which was left blank (Statement Nos. 29). Hearn explained that the reason question #24 of the Renewal Application was left blank was due to an apparent "oversight" on her part (Statement No. 30). SNL's President, Mike Chinn, reviewed the

4

Renewal Application, signed it on July 24, 2008, and it was sent to Lee Insurance Agency for submission to Philadelphia (Statement Nos. 28, 29).

Because the response to question #24 on the application was material to the risk, Philadelphia required SNL's answer to this question on whether SNL was involved in any litigation prior to binding the renewal (Statement No. 31). At that time, the SNL's executives were attending a board meeting in New York, so Hearn contacted SNL's CFO, Teresa Torian, by telephone to ask for SNL's response to question #24 of the Renewal Application (Statement No. 32). Torian advised her there SNL was not involved in any litigation, so Hearn completed question #24 of the Renewal Application by responding "no" (Statement No. 37). Because no executives were in the office to sign the Renewal Application, Hearn signed it herself and sent the completed application to Lee Insurance Agency on July 30, 2008 (Statement No. 37). The next day Lee Insurance Agency confirmed that coverage was bound for the policy renewal (Statement No. 38).

Within a few days after coverage was bound, Philadelphia received a request from SNL to increase the $1,000,000 limits of liability in its renewal policy, asking for quotes for limits of $2,000,000 up to $10,000,000 (Statement No. 39). Philadelphia required that SNL complete a "warranty letter", which would involve additional inquiry into the status of any pending claims. SNL thereafter abandoned its request for higher limits (Statement No. 39).

On August 12, 2008, counsel for SNL received a demand of $1,200,000 from Schwartz to settle the Greenberg claim (Statement No. 42). SNL and its counsel had extensive communications regarding SNL's response to Greenberg's settlement demand, but still never advised Philadelphia of the demand (Statement Nos. 43, 44). SNL, by

5

counsel, sent a letter to Greenberg's counsel dated September 9, 2008 rejecting the settlement demand outright (Statement No. 45).

Greenberg's response to SNL's letter was to file the complaint previously drafted and displayed, which he did on October 3, 2008 in the Supreme Court of the State of New York, County of New York, Index No. 08113432 (Statement No. 46). SNL awaited service of the suit, which was effected on SNL through the New York Department of State on October 9, 2008 (Statement Nos. 47, 48). SNL's Corporate Secretary, Dan Oakley, received a copy of the Complaint on October 20, 2008 (Statement No. 49). SNL discussed the Greenberg lawsuit among its corporate officers (Statement No. 50). About a week later, SNL notified Philadelphia of the Greenberg claim through its insurance agent, constituting Philadelphia's first notice of the claim (Statement No. 51).

Upon receiving notice of the pending litigation, Philadelphia conducted an investigation into the Greenberg claim, and learned that SNL had received notice of the claim months earlier, in January, and had knowledge of the litigation since June, 2008 (Statement No. 52). Based on its investigation, Philadelphia disclaimed coverage for the Greenberg claim by letter to SNL dated November 21, 2008 (Statement No. 53). Philadelphia also advised Greenberg's counsel of its declination of coverage to SNL (Statement No. 54).

Philadelphia filed the instant action on January 27, 2009 seeking a declaration that the Policy covers the Greenberg claim. SNL filed an Answer denying SNL is entitled to coverage under the Policy, and a Counterclaim seeking rescission of the Policy based on SNL's material misrepresentation in the Renewal Application, and a declaration that the Philadelphia is under no obligation under the Policy to defend or indemnify SNL against

6

the Greenberg litigation.

## II.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is properly entered, under Fed. R. Civ. P. 56, if the evidence before the Court establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Pennsylvania Life Ins. Co. v. Bumbrey, 665 F. Supp. 1190, 1192 (E.D. Va. 1987).  A genuine issue exists only if a "fair-minded jury could return a verdict for the [non-moving party] on the evidence presented."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  Only disputes that may affect the outcome of the case are considered material.  Id. at 248.  The moving party has the initial burden to show the absence of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325; Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), *cert denied*, 513 U.S. 813, 115 S. Ct. 67, 130 L.Ed.2d 24 (1994).  The non-moving party may not rest upon mere denials but must demonstrate that a triable issue of fact exists.  Anderson, 477 U.S. at 248; Shaw, 13 F.3d at 798.  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (*citations omitted*).  Moreover, unsupported speculation is insufficient to defeat a motion for summary judgment. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  The non-moving party must present sufficient evidence that reasonable jurors could find by a preponderance of the evidence for the non-movant.  Sylvia v. Development Corp. v. Calvert County, 48 F.3d 810, 817 (4th Cir. 1995).

Generally, the construction of insurance policies involves questions of law, which makes summary judgment especially suitable for the resolution of the issues presented in this case. St. Paul Fire and Marine Ins. Co. v. Jacobson, 826 F. Supp. 155, 157 (E.D.Va. 1993), *citing* John Deere Ins. Co. v. Shamrock Industries, Inc. 929 F.2d 413, 417 (8th Cir. 1991)("the interpretation and construction of insurance policies is a matter of law, and therefore, such cases are particularly amenable to summary judgment"); Morrisville Water & Light Dept. v. United States Fidelity and Guaranty Co., 775 F. Supp. 718, 722-23 (D.Vt. 1991) (summary judgment appropriate "because the construction of an insurance policy is a question of law, not fact"). The interpretation of a contract, including interpretation of a contract of insurance, is a matter of law for the court. Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers Assn. Ins. Co., 512 Pa. 420, 517 A.2d 910 (1986). For the reasons set forth below, summary judgment is appropriate in this case, and should be granted in favor of Philadelphia.

**B.    Choice of Law**

In this case, different jurisdictions come into play. The Policy was issued to SNL located in Charlottesville, Virginia by Philadelphia, a company based in Bala Cynard, Pennsylvania. The loss is alleged to have occurred at SNL's office in New York, which is where the underlying Greenberg lawsuit was filed. The instant suit was filed in Virginia.

In Virginia, contracts are interpreted according to the doctrine of *lex loci,* or the state where the contract was made. Factory Mutual Ins. Co. v. Liberty Mutual, 518 F.Supp.2d 803 (W.D. Va. 2007); Silicon Image, Inc. v. Genesis Microchip, Inc., 271 F. Supp.2d 840, 849 (E.D. Va. 2003); Johnson v. MPR Associates, 894 F. Supp. 255, 258

8

n.1 (E.D. Va. 1994); St. Paul Fire and Marine Ins. Co. v. Jacobson, 826 F. Supp. 155, 157 (E.D. Va. 1993).  Unless otherwise provided in the contract or by statute, "a contract is made at the place where the contract is executed; the contract is executed where acceptance occurs; and acceptance occurs where the last act is done which is necessary to make it binding." Western Branch Holding Co. v. Trans Marketing Houston, 722 F.Supp. 1339, 1341 (E.D. Va. 1989).  *See also*, Blue Cross and Blue Shield Ass'n v. Group Hospitalization and Medical Services, Inc., 744 F.Supp. 700, 713 (E.D.Va. 1990).

In cases interpreting insurance contracts, the last act necessary to complete the contract is often the delivery of the policy to the insured.  *See*, Federal Ins. Co. v. New Coal Co., Inc., 415 F.Supp.2d 647 (W.D.Va. 2006); Gulf Underwriters Ins. Co. v. KSI Services, Inc., 416 F.Supp.2d 417 (E.D.Va. 2006); Seabulk Offshore, Ltd. v. American Home Assur. Co., 377 F.3d 408 (4th Cir. 2004).

Here, that last act was delivery of the policy to SNL Financial in Charlottesville, Virginia, so Virginia law should govern in this insurance coverage case.

### C.     Contract Interpretation

Under Virginia law, the construction of insurance contracts is a question of law to be resolved by the court, with the burden on the insurer to prove that coverage does not apply.  Ambiguities are generally resolved in favor of coverage.  *See*, West American Ins. Co. v. Johns Bros., Inc., 435 F.Supp.2d 511, 513-14 (E.D.Va. 2006).  However, insurance contracts are interpreted according to general principles of policy construction, and courts should "give the language its plain and ordinary meaning and enforce the policy as written" and not strain to find ambiguities.  Factory Mutual, *supra*, 518 F. Supp 2d at 809; *see also* Thomas v. Standard Fire Ins. Co., 414 F.Supp. 2d 567, 571 (The court

9

cannot "create an ambiguity by strained and over-refined construction of ordinary words which would otherwise not exist"); Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp.2d 785, 792 ("A term is not ambiguous simply because parties disagree about it meaning. Nor is a term ambiguous simply because courts have reached different conclusions as to its definition"). Furthermore, courts are not authorized to rewrite an insurance policy for the parties, nor construe a policy contrary to its plain language or the parties' intent. America Online, Inc. v. St. Paul Mercury Insurance Co., 347 F.3d 89, 93 (4th Cir. 2003).

### D. SNL's Failure to Report the Greenberg Claim Bars Coverage.

Philadelphia's policy, outlined below, has clear and unambiguous language under the Insuring Agreement, the definition of "claim" and the notice and claim reporting provisions, and this language should be enforced as written.

**1. The Policy**

Philadelphia Insurance Company issued Private Company Protection Plus[1] policy, number PHSD350225 (renewal of PHSD145790) to SNL Financial LC for the policy period of 8/1/08-8/1/09. Limits of liability are $1,000,000 each Policy Period for Parts 1, 2 and 3/$1,000,000 aggregate for all parts. The deductibles are $10,000 for each Claim under Part 1, $15,000 for each Claim for Part 2, and $5,000 for each Claim under Part 3.

The pertinent policy language for this opinion is as follows:

PART 2 – EMPLOYMENT PRACTICES LIABILITY INSURANCE

I.      Insuring Agreement

The Underwriter shall pay on behalf of the Insured, Loss from Claims made against the Insured during the Policy Period (or, if applicable, the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for an Employment Practice Act.

---

[1] Coverage includes Directors and Officers & Private Company Liability Insurance, Employment Practices Liability Insurance and Fiduciary Liability Insurance.

\*        \*        \*

PART 4 – COMMON POLICY DEFINITIONS

A.  Application means:

    1.  the Application for this Policy, including any material submitted therewith, and
    2.  the Application(s), including any material submitted therewith, for all previous policies issued by the Underwriter of which this Policy is a direct or indirect renewal or replacement, all of which shall be deemed a part of this Policy as if physically attached hereto.

B.  Claim means:

    1.  a written demand for monetary or non-monetary relief;

    2.  a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

\*        \*        \*

A claim shall be considered made when an Insured first received notice of the Claim.

IV.  NOTICE/CLAIM REPORTING PROVISIONS

\*        \*        \*

    A.  In the event that a Claim is made against the Insured, the Insured shall, as a condition precedent to the obligations of the Underwriter under this Policy, give written notice to the Underwriter as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such a claim, but not later than 60 days after the expiration of this Policy, Extension Period, or Run-Off Policy, if applicable.

    B.  If during this Policy Period an Insured first becomes aware of any circumstances which may subsequently give rise to a Claim being made against any Insured for a specific alleged Wrongful Act, and as soon

11

as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the Underwriter of the circumstances and the reasons for anticipating such a Claim, with full particulars as to the Wrongful Act, dates and persons involved, then any Claim which is subsequently made against the Insured arising out of such Wrongful Act will be considered made during this Policy Period.

C.  All Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed one Loss on account of one Claim.  Such Claim shall be deemed to be first made when the earliest of such Claims was first made or first deemed made pursuant to Clause B. hereinabove.

VI.  REPRESENTATIONS AND SEVERABILITY

A.  The Insured represent that the particulars and statements contained in the Application are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the Underwriter under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.  Except for material facts or circumstances known to the Individual Insured signing the Application, no statement in the Application or knowledge or information possessed by and Insured shall be imputed to any other Individual Insured for the purpose of determining the availability of coverage.

**2. Late Notice**

The policy requires notice of a claim "as soon as practicable."  In Virginia, this policy provision has been found to be reasonable and enforceable.  <u>Penn-American Ins. Co. v. Mapp</u>, 461 F.Supp.2d 442, 452 (E.D.Va.2006).  The policy further states, and Virginia law agrees, that the notice provision is a condition precedent to coverage.  <u>Id</u>.  As such, SNL's failure to notify Philadelphia of the Greenberg claim for <u>nine</u> <u>months</u> bars coverage for the claim.

Additionally, Virginia law does not require an insurer to show prejudice from an

insured's material and substantial breach of his policy.  <u>Vermont Mutual Ins. Co. v. Everette</u>, 875 F.Supp. 1181 (E.D.Va. 1995).  In <u>Atlas Ins. Co. v. Chapman</u>, 888 F.Supp. 742 (E.D.Va. 1995), the insurer was not required to show that it was prejudiced by a 126-day delay in giving notice of an accident without any excuse or sufficient justification.  The court found this delay to be a substantial and material violation of the policy's notice requirement.  The court went on to explain the rationale behind the rule requiring compliance with the notice provision:

> Absent the requirement of prompt notice by the insured of all accidents and occurrences which could implicate the policy, the insurer is at the mercy of its insured's willingness to reveal such potential claims. As the Virginia Supreme Court has made plain, notice provisions are designed to afford the insurer the opportunity to make a timely investigation of all circumstances surrounding the accident and to prepare an adequate defense if necessary on behalf of the insured.

<u>Id</u>. at 745.  <u>Penn-America</u> underscored that the insured need not be prejudiced by delayed notice, and applied three factors in determining whether the breach of policy through delay was "material": (1) reasonableness of delayed notice, (2) amount of prejudice suffered by insurer as result of delay, and (3) length of time that elapsed before notice was given. <u>Penn-America</u>, *supra,* 461 F.Supp.2d 442 at 452.  The Court noted that Virginia follows an objective standard, requiring notification of a claim when it reasonably appears to the insured that the policy may be implicated.  <u>Penn-America</u>, 461 F.Supp.2d at 453.  Failure to give timely notice is not excused where the insured subjectively concludes coverage will not be implicated under the policy or is ignorant of the policy notice provisions.  <u>Nationwide Mutual Fire Ins. Co. v. Overstreet</u>, 568 F.Supp.2d 638, 645 (E.D.Va.2008).  Rather, the duty to notify the insurer arises when an incident occurs " 'which was sufficiently serious to lead a person of ordinary intelligence

13

and prudence to believe that it might give rise to a claim for damages covered by [the] policy.' " Id*.*, *citing* State Farm Fire & Casualty Co.v. Walton, 244 Va. 498, 423 S.E.2d 188 (1992).

Here, SNL received a written demand meeting the policy definition of a "claim" in January 2008, notified its outside counsel immediately, and viewed the letter to be a "legal action". Similarly, SNL's counsel saw potential federal litigation likely and issued a "litigation hold" letter to SNL advising it to preserve evidence. SNL's counsel also understood from the beginning that the January 2008 letters from Murray Schwartz amounted to notice of a claim for monetary or non-monetary relief. Clearly, SNL believed at the time that the demand from Greenberg's counsel would give rise to a claim for money damages, or at least a request for some non-monetary relief, such as restitution. Either of these circumstances is encompassed in the policy definition of "claim", and SNL had a clear to notify Philadelphia of the Greenberg claim.

SNL had subsequent opportunities to notify Philadelphia during the policy period and yet failed to do so. SNL knew that Greenberg's attorney had drafted a complaint to be filed in the Supreme Court as early as May, 2008. The details of the complaint were described in June, and the complaint itself was reviewed in July by counsel for SNL. SNL knew that Greenberg was claiming that SNL discriminated against him on the basis of age and perceived disability, and sought $6,000,000 in compensatory damages and $10,000,000 in punitive damages, and the company still failed to report the claim to Philadelphia. Knowledge that was acquired by SNL's attorneys in the course of their representation is imputed to SNL. Yamada v. McLeod*,* 243 Va. 426, 433, 416 S.E.2d 222 (1992); *see also,* Allen Realty Corp. v. Holbert, 227 Va. 441, 446, 318 S.E.2d 592, 594

14

(1984) (generally, knowledge of agent imputed to principal). SNL's President, Mike Chinn, testified that he thought the allegations were "baseless" so there was no need to notify Philadelphia (Statement No. 41). As noted above, failure to give timely notice is not excused where the insured subjectively concludes coverage is not implicated. Overstreet, supra, 568 F.Supp.2d 638 at 645.

SNL witnesses testified that they had not even read the Policy (Statement No. 57). SNL had no policies or procedures in place for the reporting of insurance claims (Statement No. 58). SNL also complained that its counsel never advised SNL to notify its insurance carrier of the Greenberg claim (Statement No. 55).[2] In any event, SNL's ignorance of the policy terms and conditions does not excuse it from providing timely notice to Philadelphia. Id.

In the following cases, the courts found as a matter of law that delay in notification of a claim constituted a substantial and material breach of the notice requirement, precluding coverage: Chapman, *supra*, 888 F.Supp. 742 (notice given 126 days after occurrence); Vermont Mutual Ins. Co. v. Everette, 875 F.Supp. 1181, 1187 (E.D.Va.1995)(three years); Walton, *supra*, 244 Va. at 500-01(two years); Liberty Mutual Ins. Co. v. Safeco Ins. Co. of America, 223 Va. 317, 288 S.E.2d 469, 473 (1982) (a delay of 51 days resulted in a finding that the delayed notice, without any justification, was a breach of the policy condition); Lord v. State Farm Mutual Automobile Ins. Co., 224 Va. 283, 288, 295 S.E.2d 796 (1982)(173 days); Mt. Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co., 224 F.Supp. 666 (E.D.Va.1963)(ten months). In view of these decisions, the delay of nine months in the instant case was a clear violation of the

---

[2] Counsel for SNL testified that he was not aware that SNL had insurance coverage for employment practices, but in his experience, the letters of January 18, 2008 and January 24, 2008 from Schwartz to SNL would have triggered that coverage (Statement No. 56).

15

Policy's notice provision.

SNL contends that the policy was not triggered until the service of the complaint on SNL in October 2008, claiming the January letter did not contain a written demand for monetary relief. As noted in the definition of "claim" above, the written demand requiring notice may also seek non-monetary relief, in this case a resolution of the discrimination claim. The demand in January was sufficiently serious to lead a person of ordinary intelligence and prudence to believe that it might give rise to a claim for damages. At a minimum, SNL understood that Greenberg's counsel was seeking non-monetary relief, such as reinstatement (Statement No. 7). At the outset, the memo from SNL's New York attorney outlining the complaint in July clearly met this test. It is not reasonable to claim that actual service of the suit was the trigger for coverage, as this construction is contrary to the clear policy terms. As compliance with the notice provision is a contractual precondition to coverage, SNL's failure to timely notify Philadelphia releases it from any duty to defend or indemnify SNL for the Greenberg claim.

    **E.**    **SNL's Failure to Report the Greenberg Litigation in its Renewal Application was Material to the Risk.**

SNL completed a renewal application which was signed by its President, Michael Chinn on July 24, 2008. Question 24 of the Renewal Application read as follows: "Has the Applicant been the subject or involved in any litigation in the past twelve (12) months?" Nothing was checked in the space provided. Because this information was crucial to the underwriters at Philadelphia, coverage could not be bound without an answer to this question. SNL's Controller Corinna Hearn, who was new to her job, called the CFO, who advised her to state that SNL was not involved in any litigation. She

16

checked "no" to question 24, signed the application, sent it to the insurance agency, and coverage was bound based on this false representation.

From the facts developed with regard to the Greenberg claim, this response proved to be untrue. As of June 2008, and arguably before, SNL was aware that a complaint had been drafted by counsel for Greenberg against SNL alleging discriminatory conduct and seeking millions of dollars in damages.[3] Certainly, any knowledge of SNL's attorneys would be imputed to SNL as well. Yamada v. McLeod, *supra,* 243 Va. 426 at 433.

The Renewal Application provides on p. 5 under Material Change, "If there is any material change to the answers of the Application's questions prior to the policy inception date, the Applicant must notify the Underwriter in writing. Any outstanding quotation may be modified or withdrawn." Additionally, it contains a warning for providing materially false, incomplete or misleading information, noting possible penalties of imprisonment, fines, or a denial of insurance benefits.

Immediately above Mr. Chinn's signature, the Renewal Application states:

> The Undersigned represents that to the best of his/her knowledge and belief the statements set forth herein are true. **The Undersigned further declares that any occurrence or event that takes place prior to the effective date of the insurance for which application is being made which may render inaccurate, untrue, or incomplete any statement made, will immediately be reported in writing to the Underwriter.** The Underwriter may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance. The Underwriter is hereby authorized to make any investigation and inquiry in connection with the information, statements and disclosures provided in this Application. The signing of this Application does not bind the Undersigned to purchase the insurance, nor does the review of this Application bind the insurance company to issue a policy. It is agreed that this Application shall be the basis of the contract should a policy be

---

[3] SNL's potential exposure for the Greenberg matter may explain why SNL sought a substantial increase in its policy limits in August, 2008, shortly after coverage was bound (Statement No. 35).

17

issued. This Application will be attached and become a part of the policy.

(Emphasis supplied).

Prior to the effective date of the policy of August 1, 2008, SNL had notice of the Greenberg lawsuit. Further details were provided to SNL by their attorney in New York, James Clark, who reviewed the complaint on July 30, 2008. Clark reported its contents, including the demand for $6,000,000 in compensatory and $10,000,000 in punitive damages, to SNL's counsel Sean Gibbons. Although SNL had an obligation under the Renewal Application to report this material change in its application, it failed to do so. No notice was provided by SNL to Philadelphia until actual service of the complaint in October, 2008.

> Va. Code Ann. § 38.2-309 provides:
>
> All statements, declarations and descriptions in any application for an insurance policy or for the reinstatement of an insurance policy shall be deemed representations and not warranties. No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue.

To uphold a claim for material misrepresentation in a policy application, Virginia courts consider the materiality of the statement, and look at whether truthful answers would have reasonably influenced the company in making its decision to issue a policy. Continental Casualty Co. v. Graham & Schewe, 339 F.Supp.2d 723, 728 (E.D.Va. 2004). In Graham & Schewe, an affidavit of the Director of Underwriting stating that the disclosure of a potential claim would have been material to the acceptance of the risk was sufficient to support summary judgment in favor of the insurer. Id. In the instant case, Bradley Lacey, Philadelphia's Assistant Vice President in charge of underwriting, has

18

testified that Philadelphia required question 24 of the application to be answered, and that Philadelphia had several options available to it had it been advised of the pending litigation, including nonrenewal (Statement No. 59). According to Lacey, Philadelphia would have taken some action, doing nothing was "not an option" (Statement No. 60). The statement was clearly material to the risk, and Philadelphia relied on SNL's false representation in its Renewal Application that it was not the subject of litigation in issuing the Policy (Statement No. 61). Based on the foregoing, Philadelphia is entitled to rescind the Policy on the grounds of SNL's material misrepresentation.

### III.   CONCLUSION

As noted above, SNL failed to meet a condition precedent to coverage by failing to notify Philadelphia of the Greenberg claim in a timely manner. As such, Philadelphia has no duty under the Policy to provide a defense or indemnity for the claim. Furthermore, SNL misrepresented that it was not the subject of litigation in its Renewal Application, and this misrepresentation was material to the risk underwritten by Philadelphia, so that the policy should be rescinded.

WHEREFORE, for the foregoing reasons, defendant Philadelphia Indemnity Insurance Company respectfully requests that its Motion for Summary Judgment be granted and that Judgment be entered in its favor against the plaintiff, SNL Financial, LC.

Respectfully submitted,

_____/s/_____
David D. Hudgins (Virginia Bar No. 20602)
Hudgins Law Firm
515 King Street, Suite 400
Alexandria, VA  22314
(703) 739-3300; Fax: (703) 739-3700
dhudgins@hudginslawfirm.com
*Counsel for Philadelphia Indemnity Insurance Company*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of August, 2009 I forwarded electronically defendant's Memorandum in Support of Motion for Summary Judgment to the following counsel of record:

Thomas E. Albro (Virginia Bar. No. 12812)
Tremblay & Smith, LLP
105-109 East High Street
P.O. Box 1585
Charlottesville, VA  22902
(434) 977-4455; Fax:  (434) 979-1221
Tom.Albro@tremblaysmith.com
*Counsel for SNL Financial, LC*

Dennis S. Rooker (Virginia Bar No. 16459)
Dennis S. Rooker, PC
1421 Sachem Place, Suite 3
Charlottesville, VA  22901
(434) 977-7424; Fax: (434) 974-7600
*Counsel for SNL Financial, LC*

          _____/s/_____
          David D. Hudgins (Virginia Bar No. 20602)
          Hudgins Law Firm
          515 King Street, Suite 400
          Alexandria, VA  22314
          (703) 739-3300; Fax: (703) 739-3700
          dhudgins@hudginslawfirm.com
          *Counsel for Philadelphia Indemnity Insurance Company*